1   Pacific Law, Law Offices of Steven Schectman
    Steven Schectman, SBN 98556
2   1125 16th Street, Suite 205
    Arcata, CA 95521
3   (707)825-8000       (707)825-6719 *fax*

4   Attorney for Plaintiffs Union of Medical Marijuana Providers, Arts District Patient's
    Collective, Inc., dba Arts District Healing Center, James Shaw

FILED
CLERK U.S DISTRICT COURT

JAN 2 4 2008
11:0

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNION OF MEDICAL MARIJUANA PROVIDERS, INC. ,ARTS DISTRICT PATIENT'S COLLECTIVE, INC, dba ARTS DISTRICT HEALING CENTER, JAMES SHAW | Case No. CV07-07951-(AHM)(FMOx) |
| Plaintiffs, | FIRST AMEMED COMPLAINT |
| -v- | FOR CIVIL RIGHTS VIOLATIONS (BIVENS CLAIM) DECLARATORY RELIEF AND INJUNCTIVE RELIEF |
| UNITED STATES FEDERAL DRUG ENFORCEMENT AGENCY (DEA), UNITED STATES DEPARTMENT OF JUSTICE, TIMOTHY J. LANDRUM, SPECIAL AGENT IN CHARGE OF THE LOS ANGELES FILED OFFICE OF THE DEA, DEANNE REUTER, ACTING GROUP SUPERVISOR LOS ANGELES FIELD OFFICE OF THE DEA, DOES 1-100 | |
| Defendant. | |

First Amended Complaint for Civil Rights Violation, Injunctive Relief

-- 1 --

# I. INTRODUCTION

(1) The Union of Medical Marijuana Providers (UMMP) as well as the Arts District Healing Center have brought this action in order to prevent the Drug Enforcement Agency, and its agents, from frustrating the implementation of California's Compassionate Use Act, otherwise known as the Medical Marijuana Act  (hereinafter referred to as the CUA) through extrajudicial threats.  The DEA has sent letters ("the letter" [see Exhibit 1]) to most of the commercial property owners in the Los Angeles area, that lease their commercial property for a purpose which is authorized by California law, specifically The CUA, as well as the City of Los Angeles's City Code.

(2) These laws specifically authorize legally compliant Co-ops, Collectives and or Caregivers to maintain a premise for the distribution of medical marijuana to qualified patients. Not withstanding these laws the DEA sent letters, threatening commercial property owners with up to 20 years in prison and forfeiture of their property, and specifically stating without any limitation that state law is not a defense.  One such letter was sent to the plaintiff's landlord, LA CITIPROPERTIES, LLC.

(3) After receiving the letter, the landlord filed an unlawful detainer action against the plaintiff, alleging the lease was illegal.

The plaintiff's contract with the landlord in this case expressly states that the property will be used as a medical marijuana dispensary, and that it is governed in all respects by California law.  The DEA has not shown that contracts such as the one in this case are illegal.  Their assertion is merely their own self-serving analysis of the law.  Rather than proceed through judicial channels, the DEA has resorted to extrajudicial terror tactics to thwart the Compassionate Use Act.

(4) Consistent with such threat, the DEA, in apparent retaliation, executed a search warrant when the plaintiffs opposed the landlord's unlawful detainer action that brought the legality of the "landlord letter" into question.

(6) The actions of the DEA and its agents violate the rights of the plaintiffs in several respects.  It violated the plaintiff's right to due process when it declared by administrative fiat plaintiff's contract was illegal.  It violated their first amendment rights and their right to equal protection under the law when it selectively raided Arts District Healing Center in retaliation for exercising their right to litigate.

(7) The DEA also runs afoul of several California laws.  Starting with the true underlying issue, the DEA has plainly taken the position that it will not honor the rights of people to lease commercial property for the purpose of providing their members medical marijuana under California law.  This is a plain violation of California Civil Code § 52.1(b), which provides for an action by "any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with." Such an action may be brought against any person, "whether or not acting under color of law."  (And, of course, the DEA's federal Constitutional violations also give rise to violations under Civil Code § 52.1.)

(8) Further, the DEA has violated the California extortion statute, Penal Code § 518, which provides, that "extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by **a wrongful use of force or fear, or under color of official right**." Penal Code § 519 states that "fear," such as will constitute extortion, may be induced by a threat to accuse the individual of any crime.  In this case, the DEA effectively "obtained" the property by threatening the landlord with imprisonment, forcing him to do the DEA's bidding.

## II.  JURISDICTION AND VENUE

(9) This Court has subject matter jurisdiction pursuant to 28 USC § 1331 (federal question jurisdiction).  Declaratory judgment is sought pursuant to 28 USC § 2201 and 2202.

1    (10) This Court has supplemental jurisdiction over state law claims pursuant

2   to 28 USC § 1367 (claims that are so related to federal claims that they form part of

3   the same case or controversy).

4    (11) Venue is properly in this district pursuant to 28 USC § 1391(b)(2)

5   (judicial district

6   in which a substantial part of the events or omissions giving rise to the claim

7   occurred, or a substantial part of property that is the subject of the action is situated),

8   and (e)(2) (action against federal officer or agency, district in which a substantial

9   part of the events or omissions giving rise to the claim occurred, or a substantial part

10   of property that is the subject of the action is situated).

11                                 **III. PARTIES**

12    (12) Plaintiff the Union of Medical Marijuana Providers (UMMP) is a duly

13   authorized California Corporation and is a legal advocacy group whose purpose is to

14   advocate and legally protect those entities who, pursuant to California Health and

15   Safety Code § 11362.5 et seq, legally assist qualified patients in obtaining medicinal

16   marijuana.

17    (13) The Arts District Patient's Collective, Inc., dba Arts District Healing

18   Center ("The Center"), has been legally incorporated pursuant the applicable laws of

19   California.  It has been and continues to operate as a collective pursuant to

20   California Health and Safety Code §11627.77 at all times relevant to this action.  All

21   of its members are qualified patients pursuant to California Health and Safety Code

22   §11621.  The Center is the intended beneficiary of the lease for the property located

23   at 620 East 1st Street, Los Angeles, California, (the "subject property") and has in

24   fact paid the rent for the premises.

25    (14) Plaintiff JAMES SHAW is the individual who, for and on behalf of The

26   Center, entered into a lease for the subject property from Defendant LA

27   CITIPROPERTIES, LLC.  The parties to the lease agreed that the use of the

28   premises would be for a "medical marijuana dispensary pursuant to the law of Los

First Amended Complaint for Civil Rights Violation, Injunctive Relief                    -- 4 --

Angeles and the State of California."

(15) Defendant United States Federal Drug Enforcement Agency is an agency of the federal government, within the Department of Justice.

(16) Defendant Units State Department of Justice is a Federal Agency who is charge with overseeing enforcement of Federal Law and litigation.  Defendant DEA is an agency within the U.S. Department of Justice.

(17) Defendant Timothy j. Landrum, is sued herein in his official capacity as Special Agent in charge of the Los Angeles filed office of the DEA. He is the Agent from the DEA who signed the at issue DEA letter send to plaintiffs.

(18) Defendant Deanne Reuter, is sued herein in her official capacity as Acting Group Supervisor Special Agent the Los Angeles field office of the DEA. She is the agent from the DEA Special Agent Landrum identified as the contact person within the LA office of the DEA for further information regarding the contents of the letter.

(19) The true names and capacities of Defendants sued as Does 1-100 are unknown to plaintiffs at the time of filing this complaint.  Plaintiffs reserve the right the name additional defendants if and when their name and capacity become known.

## IV. FACTS

(20) In 1996, the People of the State of California enacted Proposition 215, the Compassionate Use Act (CUA) and the legislature codified it in California's marijuana for medical purposes, upon certain conditions.  The CUA exempts a

Health and Safety Code § 11362.5 et. seq., which provides for the legal use of patient, or a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician, from prosecution under California law.

(21) Pursuant to the CUA, plaintiff The Arts District Healing Center has been and continues to operates a legally complaint medical marijuana dispensary, in leased premises at 620 E. 1st St, Los Angeles, CA for all times relevant to this action.

(22) On or about November 22, 2005 plaintiffs entered into fixed-term commercial lease with L.A. CITIPROPERTIES, LLC. The lease specifically states that the plaintiffs will be operating a medical marijuana dispensary pursuant to the CUA and the applicable Los Angeles Ordinance. The lease further specifies that in all regards it shall be governed by California law. [See Exhibit 2]

(23) On or about July 6, 2007, the LA Field Division of the DEA office sent a letter to L.A. CITIPROPERTIES, LLC, as well as up to 150 other similarly situated commercial property owners, by certified mail, which states that the DEA has determined that the defendant owns a building in which there is a marijuana dispensary. The letter ("the landlord letter"), signed by Los Angeles DEA Special Agent in Charge, Timothy J. Landrum, threatens the recipient with up to 20 years of imprisonment and forfeiture of his property. The letter states in part:

"Federal law takes precedence over State law. It is not a defense to this crime or to the seizure of the property that the facility operating on the property is providing 'medical marijuana' under California law including the provisions of California Prop. 215."

(24) Under California law, the plaintiffs are a legal dispenser of a legal medical product, dispensed only upon recommendation of a licensed physician.

(25) The threat in the letter of up to 20 years imprisonment and forfeiture of property for entering into a commercial lease governed by California law for a

1  purpose specifically authorized by state and local law, is unsupported by any legal

2  authority. Furthermore, the DEA is not empowered to issue legal opinions on

3  matters of preemption, and it is most certainly not

4  empowered to interfere with a legal contractual relationship in its zeal to prevent

5  implementation of the Compassionate Use Act.

6      (26) The Controlled Substances Act preempts state law only in the event of a

7  "positive conflict." 21 USC § 903.  The plaintiffs are entitled, pursuant to California

8  Health and Safety Code 11362 et seq., to possess and to make available to its

9  members, a legal medical product, dispensed only upon recommendation of a

10  certified physician.  In fact, despite the DEA's opinion, the Compassionate Use Act

11  is not in positive conflict with the Controlled Substances Act, and is not preempted.

12      (27) On September 5, 2007, entirely on the basis of the landlord letter, the

13  plaintiff's landlord, LA CITIPROPERTIES, LLC, initiated an action for unlawful

14  detainer and rescission of the lease.  Los Angeles Superior Court case no. 07U-

15  09846.  (See Exhibit 3)

16      (28) The plaintiff, JAMES SHAW on behalf of the Arts District Healing

17  Center, filed an answer and commenced discovery in the unlawful detainer action,

18  and trial was set initially for October 2, then continued to October 15, 2007.  Prior to

19  the trial, the parties stipulated that most of the issues to be determined in the trial

20  would be related to the legal assertions contained in the DEA letter sent to the

21  owners of the property.

22      (29) On October 11, 2007, four days prior to the scheduled trial, agents from

23  the Los Angeles office of the DEA executed a search warrant at 620 E. 1st St.  As a

24  result of the execution of that warrant, unknown quantities of marijuana and seized.

25  currency were seized.  Additionally several bank accounts were frozen and the funds

26      (30) Prior to seeking the at issue search warrant, defendant DEA had sent out

27  many dozens of the same type of letter received by the owners of 620 E. 1st St. to

28  other property owners in the LA region.  Each one of those letters contains the

statement that the, "DEA has determined there is a marijuana dispensary, operating at the property (the name of the specific property is inserted). This is a violation of federal law".

(31) However unlike all the other "dispensaries" identified and thoroughly investigated by the DEA, plaintiff Arts District Healing Center was one of the only ones, if not in fact the only one, that had availed itself of the California judicial system in order to litigate the legality of the assertions contained in the DEA letter.

(32) Subsequent to the execution of the search warrant, Plaintiff Arts District Healing Center did not shut down and did proceed to trial in the DEA inspired Unlawful Detainer. The case came to trial on October 15. The trial court dismissed the action because the relief requested was beyond the subject matter jurisdiction allowed in California's Unlawful Detainer statutes. Consequently, and as a result, the resolution of the substantive issue remains unresolved. However the trial Judge, the Honorable Carol Goodson, explicitly stated in her order that the matter should be litigated in a general litigation courtroom, for a full determination of the issues to be decided in court. The judge also opined that she felt confident both the property owner and the tenant in this matter should be protected while this matter proceeds in the courts.

(33) On October 19, 2007 counsel for the Arts District Healing Center sent a letter to Special Agent Timothy Landrom of the Los Angeles office of the DEA in which the above reference facts regarding the vindictive and retaliatory search warrant application and execution were explained. The letter requested that the DEA agree to disclose to the Court the Good Faith basis of why any application for a search warrant of the Arts District Healing Center was being sought at that particular time and the factual basis the decision to seek the warrant was made. No request was made by plaintiff that the DEA disclose any of this information to anyone other that the Judge to whom such application was made. Attached and marked as Exhibit 4.

(34) On or about October 24, 2007 Michael Seidel, Acting Associate Chief Counsel of the Administrative Law Section of the US Department of Justice Drug Enforcement Agency sent a reply letter. Attached and marked as Exhibit 5. Such letter failed to address any of the concerns Plaintiffs set forth in their letter of October 19th.  Instead the letter appeared to be a generic form letter that described how a citizen may use the FOIA Request Procedure to obtain information that Plaintiff did not seek. In short, the response has left Plaintiff Arts District Heading Center and James Shaw with the very real concern that the DEA will continue to use its police powers in an inappropriate manner in order to retaliate against them for their continued assertions of their constitutional rights to seek redress in any duly constituted courts.

(35) On November 27, 2007 and in accordance with the State court's order, the plaintiffs have filed a declaratory judgment action in the California Superior Court, to determine their rights as a lessee under California law.  Case no. 07U21837  And the landlord, LA CITIPROPERTIES, LLC, on October 4, 2007 petitioned for a writ in the Superior Court Appellate Division.  Case no. 07U09846. Plaintiffs First Amendment rights to freedom of speech and association, their Fifth Amendment Right to due process, and their rights under the Compassionate Use Act and other California statutes, remain imperiled.

## IV.  CLAIMS FOR RELIEF

### (As to plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw only)

### Count One: Violation of Right to Due Process of Law (*Bivens* action)

(36) By their intentional interference with the plaintiff's contractual rights under color of law, achieved by unlawfully terrorizing the plaintiff's landlord, the defendants have willfully deprived the plaintiff of his property rights without due

First Amended Complaint for Civil Rights Violation, Injunctive Relief                    -- 9 --

process of law, in violation of the Fifth Amendment.

### Count Two: Violation of First Amendment Rights (*Bivens* action)
**(As to plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw only)**

(37) The defendants executed the raid on the plaintiff's premises on October 11, 2007, and the concomitant seizure of assets and freezing of funds, in retaliation for the plaintiff's exercise of his First Amendment right to petition the government.

### Count Three: Violation of Constitutional Rights (California Civil Code § 52.1)
**(As to plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw only)**

(38) The actions of the DEA constitute violations of the plaintiff's federal rights, as stated in Counts 1 and 2, and also of his rights to petition the government (Cal Const. Art 1, § 3(a), and due process (id., § 7) under the California Constitution.  These acts also violate the plaintiff's rights under the California Compassionate Use Act.  Consequently, it is in violation of California Civil Code § 52.1, which provides a private right of action against any person, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state.

### Count Four: Extortion
**(As to plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw only)**

(39) The defendants obtained effective control over the landlord's property, and over the plaintiff's leasehold interest, by threat of prosecution.  This conduct is

"extortion" under California Penal Code § 518, which provides, that "extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."

### Count Five: Injunctive Relief
### (As to plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw only)

(40) The acts of defendants as set forth above constitutes an unlawful use of their police powers as it relates to their decision to seek a search warrant application for the premises of plaintiffs, Arts District Patient's Collective, Inc., dba Arts District Healing Center and James Shaw. Said plaintiffs have a justifiable concern that defendants will continue to use their police powers for vindictive and retaliatory purpose. Consequently, plaintiffs seek a preliminary injunction to ensure that any Judge, if and when presented with a search warrant application for the at issue premises, is affirmatively provided an explanation by the requesting law enforcement agency the good faith reasons they have to seek the warrant against these plaintiff during the time period commencing with the filing of this action up to and including the final disposition of this action.

### Count Six: Injunctive Relief
### (As to plaintiffs all plaintiff)

(41) The acts of defendants as set forth herein as it relates to the "letter" sent to Commercial Property Owners who have leased their property to legally authorized Medical Marijuana Providers pursuant to California Law constitute an impressible act. As such plaintiff seek a permanent injunction against the DEA, prohibiting any further publication of the "landlord letter," such as the one sent to

the plaintiff or any similar letter threatening legal lessors under the CUA with punishment under federal law.

## V. DEMAND FOR JUDGMENT

For the violations set forth above, the plaintiff prays for:

(1) Monetary damages, according to proof

(2) A permanent injunction against the DEA, prohibiting any further publication of the "landlord letter," such as the one sent to the plaintiff or any similar letter threatening legal lessors under the CUA with punishment under federal law.

(3) A preliminary injunction to ensure that any Judge, if and when presented with a search warrant application for the at issue premises, is affirmatively provided an explanation by the requesting law enforcement agency that sets forth the good faith reasons they have to seek the warrant against these plaintiff during the time period commencing with the filing of this action up to and including its final disposition.

(3) costs of suit herein

(4) reasonable attorney's fees

(5) such other relief that is in the interest of justice.

Dated: December 17, 2007          By _____

Steven Schectman
Attorney for Plaintiffs



# STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
## AIR COMMERCIAL REAL ESTATE ASSOCIATION

1.      **Basic Provisions ("Basic Provisions").**

1.1      **Parties:** This Lease ("Lease"), dated for reference purposes only <u>November 22, 2005</u> , is made by and between <u>LA CITIPROPERTIES LLC</u>

("Lessor")                                                                                                          and
<u>James Shaw, an individual</u>

("Lessee"), (collectively the "Parties", or individually a "Party").

1.2(a)      **Premises:** That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known by the street address of <u>620 E. 1ST Street</u> , located in the City of <u>Los Angeles</u> , County of <u>Los Angeles</u> , State of <u>California</u> , with zip code <u>90012</u> , as outlined on Exhibit _____ attached hereto ("Premises") and generally described as (describe briefly the nature of the Premises): <u>mixed used</u>

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the any utility raceways of the building containing the Premises ("Building") and to the common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

1.2(b)      **Parking:** <u>none</u> _____ ¡ unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3      **Term:** <u>3</u> _____ years and _____ months ("Original Term") commencing <u>December 15, 2005</u> ("Commencement Date") and ending <u>December 14, 2008</u> ("Expiration Date"). (See also Paragraph 3)

1.4      **Early Possession:** <u>upon evidence of insurance</u> ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5      **Base Rent:** $ <u>1,700.00</u> per month ("Base Rent"), payable on the <u>first of each month</u> day of each month commencing <u>December 15, 2005</u> (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

1.6      **Lessee's Share of Common Area Operating Expenses:** <u>80.25</u> percent (<u>25%</u> %) ("Lessee's Share"). Lessee's Share has been calculated by dividing the approximate square footage of the Premises by the approximate square footage of the Project. In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7      **Base Rent and Other Monies Paid Upon Execution:**

(a)      Base Rent: $ <u>1,700.00</u> for the period <u>December 2005 through December 2006</u>
                                                                        See Addendum #80

(b)      Common Area Operating Expenses: $ <u>TBD</u> for the period <u>Duration of Lease</u>

(c)      Security Deposit: $ <u>3,400.00</u> ("Security Deposit"). (See also Paragraph 5)

(d)      Other: $ _____ for _____

(e)      Total Due Upon Execution of this Lease: $ <u>5,100.00</u>

1.8      **Agreed Use:** <u>Dispensing medical cannabis and other related uses, all to be legal in the City and County of Los Angeles, California</u> . (See also Paragraph 6)

1.9      **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

1.10      **Real Estate Brokers:** (See also Paragraph 15)

(a)      Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☐ _____ represents Lessor exclusively ("Lessor's Broker");

☐ _____ represents Lessee exclusively ("Lessee's Broker"); or

☑ <u>Magnum Properties Inc</u> represents both Lessor and Lessee ("Dual Agency").

(b)      Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or 5% % of the total Base Rent for the brokerage services rendered by the Brokers).

PAGE 1 OF 1T

INITIALS

EX 1

1.11 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by <u>James C. Shaw</u> ("Guarantor"). (See also Paragraph 37)

1.12 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs <u>51</u> through <u>65</u> ;
☐ a site plan depicting the Premises;
☐ a site plan depicting the Project;
☐ a current set of the Rules and Regulations for the Project;
☐ a current set of the Rules and Regulations adopted by the owners' association;
☐ a Work Letter;
☐ other (specify): _____

**2. Premises.**

2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

2.2 **Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law . If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. ~~The warranty periods shall be as follow: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls --- see Paragraph 7).~~

2.3 **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for the portion of such costs reasonably attributable to the Premises pursuant to the formula set out in Paragraph 7.1(d); provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessor on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such change in use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4 **Acknowledgements.** Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its

INITIALS

**005**

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

occupancy of the Premises, and (c) neither ___ sor, ___ sor's agents, nor Brokers have made any ___ or representa ___ ID ___ ___ with respe ___ to ___ e ___ or ___ in conne ___ _____ Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

**2.5** **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessor shall be responsible for any necessary corrective work.

~~2.6 Vehicle Parking. Lessee shall be entitled to use the number of parking spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles." Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor. In addition:~~

~~(a) Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.~~

**(b)** Lessee shall not service or store any vehicles in the Common Areas.

**(c)** If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

**2.7** **Common Areas - Definition.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

**2.8** **Common Areas - Lessee's Rights.** Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand of Lessor.

**2.9** **Common Areas - Rules and Regulations.** Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

**2.10** **Common Areas - Changes.** Lessor shall have the right, in Lessor's sole discretion, from time to time:

**(a)** To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

**(b)** To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

**(c)** To designate other land outside the boundaries of the Project to be a part of the Common Areas;

**(d)** To add additional buildings and improvements to the Common Areas;

**(e)** To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

**(f)** To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

**3.** **Term.**

**3.1** **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

**3.2** **Early Possession.** If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such possession shall not affect the Expiration Date.

**3.3** **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of the delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

**3.4** **Lessee Compliance.** Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its

INITIALS

©1995 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-4-3/04E

006

obligations under this Lease from and after the Start Date until the possession is tendered to Lessee or such possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.    Rent.**

4.1    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2    **Common Area Operating Expenses.** Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a)    "**Common Area Operating Expenses**" are defined, for purposes of this Lease, as all costs incurred by Lessor relating to the ownership and operation of the Project, including, but not limited to, the following:

(i)    The operation, repair and maintenance, in neat, clean, good order and condition , and if necessary the replacement, of the following:

(aa)    The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, and roof drainage systems.

(bb)    Exterior signs and any tenant directories.

(cc)    Any fire sprinkler systems.

(ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not metered.

(iii)    Trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(iv)    Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(v)    Real Property Taxes (as defined in Paragraph 10).

(vi)    The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

(vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

(viii)    Auxiliers', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(ix)    The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

(x)    Any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide these services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d)    Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

(e)    Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

4.3    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.    Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable

INITIALS                                                                                                                    INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

**007**

exceeds 12 times the then monthly Base R___ or $1___,000, whichever is greater, give written ___ Lessor of any ___, or $1___,000, whichever is greater, give written ___ within 30 days after receipt of following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

**6.3      Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to such Requirements, without regard to whether said Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

**6.4      Inspection: Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of written request therefor.

**7.      Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

**7.1      Lessee's Obligations.**

    (a)      **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

    (b)      **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler and pressure vessels, (iii) clarifiers, and (iv) any other equipment, if reasonably required by Lessor.  However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

    (c)      **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

    (d)      **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

**7.2      Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

**7.3      Utility Installations; Trade Fixtures; Alterations.**

    (a)      **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

    (b)      **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but

INITIALS                                                                                                    INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

**008**

upon notice to Lessor, as long as they are ___ t visi___ rom the outside, the cumulative cost thereof during this Lease as extended does w ___ ___ ___ ___ ___ electrical, plumbing, HVAC, and/or lighting safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)     **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialman's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4     **Ownership; Removal; Surrender; and Restoration.**

(a)     **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)     **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)     **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.     **Insurance; Indemnity.**

8.1     **Payment of Premiums.** The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2     **Liability Insurance.**

(a)     **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement and coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)     **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3     **Property Insurance - Building, Improvements and Rental Value.**

(a)     **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

**009**

property insurance coverage amount by Lessor at less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence.

(b) **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c) **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d) **Lessee's Improvements.** Since Lessor is the insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4 **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5 **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be so defended or indemnified.

8.8 **Exemption of Lessor from Liability.** Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor nor from the failure of Lessor to enforce the provisions of any other lease in the Project. Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

8.9 **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9. **Damage or Destruction.**

9.1 **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

010

(c)    "Insured Loss" shall mean damage or destruction to improvements owned by Lessor at the time of the occurrence which are caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)    "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises which requires repair, remediation, or restoration.

9.2    Partial Damage - Insured Loss. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to; (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    Partial Damage - Uninsured Loss. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    Total Destruction. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    Damage Near End of Term. If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    Abatement of Rent; Lessee's Remedies.

(a)    Abatement. In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)    Remedies. If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    Termination; Advance Payments. Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8    Waive Statutes. Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    Real Property Taxes.

10.1    Definition. As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license

INITIALS _____                                                                INITIALS _____

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                      FORM MTN-4-8/04E

011

fee imposed upon or levied against any lessor's equitable interest of Lessor in the Project, or Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct power to tax, including any city, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, levied against any legal or equitable interest of Lessor in the Project or any portion thereof, (iii) any tax, fee, or excise, however described, whether or not now customary or within the contemplation of the Parties, or operated in reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2    **Payment of Taxes.** Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3    **Additional Improvements.** Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4    **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    **Personal Property Taxes.** Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessee's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

12.1    **Lessor's Consent Required.**

   (a)    Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

   (b)    Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

   (c)    The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

   (d)    An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

   (e)    Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

   (f)    Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

   (g)    Notwithstanding the foregoing, allowing a diminimus portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

   (a)    Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under the Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

   (b)    Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

   (c)    Lessor's consent to any assignment or subletting shall not constitute consent to any subsequent assignment or subletting.

   (d)    In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

012

Lessor's remedies against any other person . . . entity . . . responsible therefore to Lessor or any . . . see . . .

Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 35)

(f)     Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)     Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)     Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of the sublessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)     In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)     Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)     No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)     Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.     **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)     The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)     The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.

(c)     The commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d)     The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material data safety sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)     A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)     The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)     The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)     If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case . . .

PAGE 11 OF 17

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

013

of an emergency (without notice), Lessor, at its option, perform such duty or obligation, Lessee's behalf including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)     Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)     Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)     Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a)     Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)     Performance by Lessee on Behalf of Lessor. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.     Condemnation. If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of Lessee's Reserved Parking Spaces, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing,

INITIALS _____                                                                                    INITIALS _____

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM MTN-4-8/04E

014

this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the reduction in Utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15.     Brokerage Fees.**

15.1     **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2     **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessee's Broker for the limited purpose of collecting any brokerage fee owed.

15.3     **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16.     Estoppel Certificates.**

(a)     Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)     If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c)     If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.     Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.     Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.     Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

**20.     Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.     Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.     No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees) of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

**23.     Notices.**

23.1     **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

INITIALS

**015**

time hereafter designated in writing.

23.2  Date of Notice.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.  Waivers.  No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.  The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.

(a)  When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)  Lessor's Agent.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  To the Lessor:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor:  (a)  Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b)  A duty of honest and fair dealing and good faith.  (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)  Lessee's Agent.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor:  (a)  Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b)  A duty of honest and fair dealing and good faith.  (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)  Agent Representing Both Lessor and Lessee.  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee:  (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b)  Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)  Brokers have no responsibility with respect to any Default or Breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)  Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.  No Right To Holdover.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.  Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.  Covenants and Conditions; Construction of Agreement.  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.  Binding Effect; Choice of Law.  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.  Subordination; Attornment; Non-Disturbance.

30.1  Subordination.  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2  Attornment.  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

016

PAGE 16 OF 17

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-4-8/04E

017

39.4    Effect of Default on Options.

(a)    Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)    The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)    An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof),or (ii) if Lessee commits a Breach of this Lease.

40.    Security Measures.    Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.    Reservations.  Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.    Performance Under Protest.  .  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

43.    Authority; Multiple Parties; Execution.

(a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

44.    Conflict.  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45.    Offer.  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46.    Amendments.  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47.    Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

48.    Mediation and Arbitration of Disputes.  An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒ is not attached to this Lease.

49.    Americans with Disabilities Act.  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.
WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: Los Angeles                                      Executed at: _____
On: November 28, 2005                                        On: _____

By LESSOR:                                                   By LESSEE:
LA CITIPROPERTIES LLC        11/30/05                        James Clinton Shaw _____

INITIALS _____                                             INITIALS _____

PAGE 16 OF 17

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                              FORM MTN-4-8/04E

018

By: _____                          By: Principal Broker individual
Name Printed: Bobby Grahm                     Name Printed: _____
Title: _____                        Title: _____

By: _____                          By: _____
Name Printed: _A Cntrifpcphti LLC             Name Printed: JAMES C. SHAW
Title: _____                        Title: _____
Address: 10005 Reevesbury Drive               Address: 620 E. 1st Street
Beverly Hills                                 Los Angeles, CA 90012
California, 90210
Telephone:(310) 612 7921                      Telephone:(310) 709 1544
Facsimile:(310) 550 1303                      Facsimile:(  )
Federal ID No.                                Federal ID No.

BROKER:                                       BROKER:
Magnum Properties, Inc                        Magnum Properties, Inc

Attn: Bobby Grahm                             Attn: Alessandro Polastri
Title: Agent                                  Title: Agent
Address: 2222 E. Washington Blvd              Address: 2222 E. Washington Blvd
Los Angeles, California 90021                 Los Angeles, California 90021
Telephone:(323) 585 3000                      Telephone:(323) 585 3000
Facsimile:(323) 858 3335                      Facsimile:(323) 585 3335
Email: rgrahm@earthlink.net                   Email:
Federal ID No.                                Federal ID No.

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make
sure you are utilizing the most current form; AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 South Flower Street, Suite 600, Los
Angeles, CA 90017.
(213) 687-8777.

©Copyright 1999 By AIR Commercial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

INITIALS                                                                    INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM MTN-4-8/04E

**019**

# ADDENDUM TO STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE – NET
## BY AND BETWEEN LA CITIPROPERTIES LLC, (LESSOR)
## JAMES CLINTON SHAW, AN INDIVIDUAL, (LESSEE)
## DATED NOVEMBER 22,2005

This Addendum is attached to and incorporated in that certain Net Standard Industrial/Commercial–Lease, dated as of November 22, 2005 by and between LA CITIPROPERTIES LLC, as Lessor, and James Clinton Shaw, an individual, as Lessee (the "Form Lease") for the defined in the body of the Lease Premises located at 620 E. 1ST Street, Los Angeles CA 90012. In the event of any inconsistency between the provisions of this Addendum and the Form Lease, the provisions of this Addendum shall govern and control, except as otherwise expressly provided in this Addendum.

51.  **Liability Insurance.** In accordance with the Lease, Lessee must obtain and provide Lessor with evidence of a commercial general liability policy of insurance naming Lessor as "additional insured" before Lessee occupies the Premises.

52.  **Lessee's Due Diligence.** Lessee acknowledges that Lessee has done its own due diligence and has verified to its satisfaction all aspects of the Premises that may affect its decision to lease the Premises, including but not limited to, the age of the building on the Premises, the size and dimensions of the Premises, the size of loading doors, of any existing traffic flow for trucks, loading and unloading, electrical service and distribution, parking, number of toilets, security, zoning, compatibility of neighboring tenants, and Lessee's ability to operate its business with the necessary permits and according to the laws, rules and regulations of the appropriate governmental jurisdictions in which the Premises is located. Lessee also acknowledges that Lessee is not relying on any representations by Lessor or Brokers or any kind, verbal or written, respecting the Premises.

53.  **Compliance with Legal Requirements.** This Paragraph 53 is intended to be in addition to and not in derogation of any covenants and acknowledgments of Lessee set forth in the Lease. Lessee acknowledges that there are various Applicable Requirements pertaining to the conduct of Lessee's business in the Premises, including but not limited to those arising from health and occupational safety, zoning laws and regulations. Lessee agrees that, throughout the term of the Lease, Lessee shall be responsible for obtaining, paying for and complying with the requirements of any and all permits, licenses, and other approvals relating to such Applicable Requirements which may be necessary or appropriate to operate its business in the Premises ("Permits"), including but not limited to those relating to zoning and health and occupational safety requirements, compliance with Health and Safety codes, including the supply restrooms for the intended use. Lessee acknowledges and agrees that Lessor shall not be liable for any failure by Lessee to obtain, pay for or comply with any requirements of such Permits, and that Lessor does not warrant the fitness of the Premises to pass any inspection or otherwise comply with any other requirement of such Permits.

54.  **Alterations and Installations.** Lessor shall at their expense "finish" patching the ceiling and paint it, otherwise Lessee agrees that the space is being leased in an "as is" state and that all alterations must be made at Lessee expense, to the Building and safety codes of the city and county of Los Angeles. Lessee shall not make any Alterations, which diminish the value of the Premises, the Lessor will

Initials: _____                                Initials: _____

not unreasonably object to any improvements that are submitted for approval, as all material alterations must be submitted, knowing that these improvements are needed for the Lessee business, as the Lessee will restore the building back to "original condition" and any other repairs or alterations prior to vacating the premises unless agreed to by Lessor to remain.

55.   **Workers' Compensation Insurance.**   Lessee shall maintain workers' compensation insurance applicable to Lessee's business in the Premises, to the extent required by applicable law.

56.   **Condition at Termination:** At the time Lessee surrenders the property to Lessor, Lessee warrants that the premises will be in as good condition as when received excepting, ordinary wear and tear or unavoidable acts of God.

57.   **Exterior Premises Upkeep And Maintenance:** Lessee at its cost will maintain the exterior of the premises including but not limited to remaining clean and free of trash and other debris.

58.   **Disclosure:** Lessee is aware that Bobby Grahm the agent of Magnum Properties, Inc personally and/or his Family has an equity interest in the 620 1st Street property and/or LA CITIPROPERTIES LLC.

59.   **Tenant Improvements:** Lessee shall do any the improvements to code and use materials that are up to OSHA and Department of Building and Safety standards.

60.   **Commencement Date:** December 15, 2005

61.   **Rental Adjustments:** Annual Increases equal to three percent (3%) per year, on the anniversary of each the actual commencement date, of every year.

62.   **Option to extend:** Providing the Tenant has not ever been in default under the terms and conditions of this Lease, They shall have the right to extend (for another two years) the Lease at the agreed upon rate which shall be compounded 3% increases as in the first two year period. The tenant must notice in writing no more then 180 days prior to expiry day but no less then 120 days from expiry of the first two-year term.

63.   **Utilities to be paid by Lessee:** Lessee shall pay their 25% share of utilities either directly to the utility company or whomever's name the utilities are in within three days of presentation of such an invoice. As in the case of water it is not individually metered

64.   **Right to Sublet:** Lessee shall have the right to sublease the premises to a credit worthy tenant with the reasonable written approval of the Lessor.

65.   **Common Area Operating Expenses:** Lessor shall furnish 2005 Operating Expenses for Taxes, Insurance and utilities which have been provided for review by Lessee . The other common area expenses will not exceed reasonable costs associated with a gardener for the back yard, trash disposal and general maintenance for the cleanliness of the common areas.

Initials: _____                    Initials: _____

Addendum Page 2 of 2

**021**

EX - 2



**U. S. Department of Justice**
Drug Enforcement Administration

Los Angeles Field Division
255 E. Temple Street, 17th Floor
Los Angeles, CA 90012
(213) 621-6700

*www.dea.gov*

Alan Grahm and Ruth Grahm
2222 East Washington Boulevard
Los Angeles, California 90021-3213

Dear Mr. and Mrs. Grahm:

**NOTICE**

The Drug Enforcement Administration (DEA) has determined you own, or have under your management or control, a building located at 620 East 1st Street, Los Angeles, California. The DEA has determined there is a marijuana dispensary, Arts District Healing Center, operating on the property. This is a violation of federal law. Federal law 21 U.S.C. § 856(a) states:

> "It shall be unlawful to knowingly and intentionally rent, lease, or make available for use, with or without compensation, [a] building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing or using a controlled substance."

Federal law takes precedence over State law. It is not a defense to this crime or to the seizure of the property that the facility operating on the property is providing "medical marijuana" under California law including the provisions of California Proposition 215. Violation of this law is a felony crime, and carries with it a penalty of up to 20 years in prison.

In addition, federal law allows for the seizure of assets, including real property, which have been used in conjunction with the distribution of controlled substances. Specifically, 21 U.S.C. § 881(a)(7) states:

> "The following shall be subject to forfeiture to the United States and no property right shall exist in them: All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land which is used in any manner or part, to commit, or to facilitate the commission of, a violation of this sub-chapter."

Drug Enforcement Administration
Notice Letter
Page Two

This letter shall serve as notice that, after a thorough investigation, the DEA has determined there is a marijuana dispensary operating on the above described property. By this notice, you have been made aware of the purposes for which the property is being used. You are further advised that violations of federal laws relating to marijuana may result in criminal prosecution, imprisonment, fines and forfeiture of assets.

For further information, please contact Acting Group Supervisor Deanne Reuter at (213) 621-6789.

Sincerely,

Timothy J. Landrum
Special Agent in Charge

**DUANE HALL**
ATTORNEY AT LAW
7131 W. Manchester Avenue
Suite 200
Los Angeles, California 90045
Tel:   (310) 215-8530
FAX: (310) 670-3678

August 3, 2007

Mr. James Shaw
and all others in possession
620 East First Street
Los Angeles, CA   90012

### NOTICE OF RESCISSION AND NOTICE TO VACATE

This office represents LA Citiproperties LLC the Landlord of the above described Premises.

Enclosed is a copy of the notice received by the Landlord from the Department of Justice.

When the lease was signed it was anticipated that the sale or distribution of medical marijuana was a legal use.

Federal Law makes that purpose unlawful and Federal Law pre-empts state and local law.  In light of the notice from the Justice Department the Landlord has no choice but to rescind the lease for the Premises, which rescission is hereby elected.

NOTICE IS HEREBY GIVEN that effective thirty (30) days after service of this notice upon you, you must vacate the Premises.

Very truly yours,


DUANE HALL

DH:dm

EX - 3

UD-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| DUANE HALL, Attorney at Law State Bar No. 71085<br>7131 W. Manchester Avenue  Suite 200<br>Los Angeles, CA  90045 | ORIGINAL FILED<br>LOS ANGELES |

TELEPHONE NO.: 310 215 8530 FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*: Plaintiff

SEP 05 2007

SUPERIOR COURT

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES

By: ____ DAWN ALEXANDER

STREET ADDRESS:   1633 Purdue Avenue

DEPUTY

MAILING ADDRESS:   Los Angeles, CA  90025

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF:  L.A. CITIPROPERTIES, LLC

DEFENDANT:  JAMES SHAW
and
[X]  DOES 1 TO   20

| COMPLAINT — UNLAWFUL DETAINER* | CASE NUMBER: |
|---|---|
| [X] COMPLAINT  [ ] AMENDED COMPLAINT *(Amendment Number)*: ____ | 07U09846 |

**Jurisdiction** *(check all that apply)*:

[X]  ACTION IS A LIMITED CIVIL CASE

Amount demanded  [X]  does not exceed $10,000

[ ]  exceeds $10,000 but does not exceed $25,000

[ ]  ACTION IS AN UNLIMITED CIVIL CASE (amount demanded exceeds $25,000)

[ ]  ACTION IS RECLASSIFIED by this amended complaint or cross-complaint *(check all that apply)*:

[ ]  from unlawful detainer to general unlimited civil (possession not in issue)    [ ] from limited to unlimited

[ ]  from unlawful detainer to general limited civil (possession not in issue)    [ ] from unlimited to limited

1. PLAINTIFF *(name each)*:    L.A. CITIPROPERTIES, LLC

   alleges causes of action against DEFENDANT *(name each)*:  JAMES SHAW

2. a.  Plaintiff is   (1) [ ] an individual over the age of 18 years.   (4) [ ] a partnership.

      (2) [ ] a public agency.   (5) [ ] a corporation.

      (3) [X] other *(specify)*:  LLC

   b. [ ] Plaintiff has complied with the fictitious business name laws and is doing business under the fictitious name of *(specify)*:

3. Defendant named above is in possession of the premises located at *(street address, apt. no., city, zip code, and county)*:

   620 E. First St.  Los Angeles, CA   90012

4. Plaintiff's interest in the premises is   [X] as owner   [ ] other *(specify)*: Landlord authorized to accept

5. The true names and capacities of defendants sued as Does is unknown to plaintiff. rent and bring suit

6. a.  On or about *(date)*:  12/05           defendant *(name each)*: as named

      (1) agreed to rent the premises as a  [ ] month-to-month tenancy  [X] other tenancy *(specify)*: lease

      (2) agreed to pay rent of $ 1,700.00 payable  [X] monthly  [ ] other *(specify frequency)*:

      (3) agreed to pay rent on the  [ ] first of the month  [X] other day *(specify)*:  15th day of each month

   b. This  [X] written  [ ] oral  agreement was made with:

      (1) [X] plaintiff.   (3) [ ] plaintiff's predecessor in interest.

      (2) [ ] plaintiff's agent.   (4) [ ] other *(specify)*:

* NOTE: Do not use this form for evictions after sale (Code Civ. Proc., § 1161a).

| Form Approved for Optional Use<br>Judicial Council of California<br>UD-100 [Rev. July 1, 2005] | COMPLAINT—UNLAWFUL DETAINER | Page 1 of 3<br>Civil Code, § 1940 et seq.<br>Code of Civil Procedure §§ 425.12, 1166<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.USCourtForms.com |

| PLAINTIFF *(Name):* | CASE NUMBER: |
|---|---|
| DEFENDANT*(Name):* | |

6.  c. [X] The defendants not named in item 6a are
    (1) [ ] subtenants.
    (2) [ ] assignees.
    (3) [X] other *(specify):*  unauthorized occupants
   d. [X] The agreement was later changed as follows *(specify):*  Current rent $1,751.00/mo

   e. [X] A copy of the written agreement, including any addenda or attachments that form the basis of this complaint, is attached and labeled Exhibit 1. *(Required for residential property, unless item 6f is checked. See Code Civ. Proc., § 1166.)*
   f. [ ] *(For residential property)* A copy of the written agreement is **not** attached because *(specify reason):*
    (1) [ ] the written agreement is not in the possession of the landlord or the landlord's employees or agents.
    (2) [ ] this action is solely for nonpayment of rent (Code Civ. Proc., § 1161(2)).

7. [X] a. Defendant *(name each):*  as named

   was served the following notice on the same date and in the same manner:
    (1) [ ] 3-day notice to pay rent or quit  (4) [ ] 3-day notice to perform covenants or quit
    (2) [X] 30-day notice to quit  *  (5) [ ] 3-day notice to quit
    (3) [ ] 60-day notice to quit  (6) [X] Other *(specify):*  *notice of rescission
  b. (1) On *(date):*  9/4/07   the period stated in the notice expired at the end of the day.
    (2) Defendants failed to comply with the requirements of the notice by that date.
  c. [ ] All facts stated in the notice are true.
  d. [X] The notice included an election of forfeiture.
  e. [X] A copy of the notice is attached and labeled Exhibit 2. *(Required for residential property. See Code Civ. Proc., § 1166.)*
  f. [ ] One or more defendants were served (1) with a different notice, (2) on a different date, or (3) in a different manner, as stated in Attachment 8c. *(Check item 8c and attach a statement providing the information required by items 7a–e and 8 for each defendant.)*

8. a. [X] The notice in item 7a was served on the defendant named in item 7a as follows:
    (1) [X] by personally handing a copy to defendant on *(date):*  8/3/07 and mailing first class mail 8/3/07
    (2) [ ] by leaving a copy with *(name or description):*
    a person of suitable age and discretion, on *(date):*  at defendant's
    [ ] residence [ ] business AND mailing a copy to defendant at defendant's place of residence on
    *(date):*  because defendant cannot be found at defendant's residence or usual place of business.
    (3) [ ] by posting a copy on the premises on *(date):*  [ ] AND giving a copy to a
    person found residing at the premises AND mailing a copy to defendant at the premises on
    *(date):*
    (a) [ ] because defendant's residence and usual place of business cannot be ascertained OR
    (b) [ ] because no person of suitable age or discretion can be found there.
    (4) [ ] *(Not for 3-day notice; see Civil Code, § 1946 before using)* by sending a copy by certified or registered mail addressed to defendant on *(date):*
    (5) [ ] *(Not for residential tenancies; see Civil Code, § 1953 before using)* in the manner specified in a written commercial lease between the parties.
  b. [ ] *(Name):*
   was served on behalf of all defendants who signed a joint written rental agreement.
  c. [ ] Information about service of notice on the defendants alleged in item 7f is stated in Attachment 8c.
  d. [ ] Proof of service of the notice in item 7a is attached and labeled Exhibit 3.

UD-100 [Rev. July 1, 2005]    **COMPLAINT—UNLAWFUL DETAINER**    Page 2 of 3

| PLAINTIFF *(Name):* | CASE NUMBER: |
|---|---|
| DEFENDANT*(Name):* | |

9. [   ]   Plaintiff demands possession from each defendant because of expiration of a fixed-term lease.

10. [   ]   At the time the 3-day notice to pay rent or quit was served, the amount of rent due was $

11. [ X ]   The fair rental value of the premises is $ 58.37          per day.

12. [   ]   Defendant's continued possession is malicious, and plaintiff is entitled to statutory damages under Code of Civil Procedure  section 1174(b).  *(State specific facts supporting a claim up to $600 in Attachment 12.)*

13. [ X ]   A written agreement between the parties provides for attorney fees.

14. [     Defendant's  tenancy is subject to the local rent control or eviction control ordinance of *(city or county, title of ordinance, and date of passage):*  LARSO April 1979 $152,120 as amended

Plaintiff has met all applicable requirements of the ordinances.

15. [ X ]   Other allegations are stated in Attachment 15. /Exhibit 2

16.   Plaintiff accepts the jurisdictional limit, if any, of the court.

17.  **PLAINTIFF REQUESTS**

a.   possession of the premises.
b.   costs incurred in this proceeding:
c. [     past-due rent of $
d. [ X ]   reasonable attorney fees.
e. [ X ]   forfeiture of the agreement.

f. [ X ]   damages at the rate stated in item 11 from *(date):*  9/5/07          for each day that defendants remain in possession through entry of judgment.

g. [   ]   statutory damages up to $600 for the conduct alleged in item 12.
h. [   ]   other *(specify):*

18. [ X ]   Number of pages attached *(specify):* 21

## UNLAWFUL DETAINER ASSISTANT (Bus. & Prof. Code, §§ 6400–6415)

19. *(Complete in all cases.)* An unlawful detainer assistant [ X ] did not [   ] did  for compensation give advice or assistance with this form. *(If plaintiff has received any help or advice for pay from an unlawful detainer assistant, state:)*

a.   Assistant's name:
b.   Street address, city, and zip code:

c.   Telephone No.:
d.   County of registration:
e.   Registration No.:
f.   Expires on *(date):*

Date:   9/5/07

DUANE HALL
_____
(TYPE OR PRINT NAME)

▶
_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

### VERIFICATION

*(Use a different verification form if the verification is by an attorney or for a corporation or partnership.)*

I am the plaintiff in this proceeding and have read this complaint. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  see attached

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PLAINTIFF)

UD-100 [Rev. July 1, 2005]                    COMPLAINT—UNLAWFUL DETAINER                    Page 3 of 3

# Pacific Law

*Law Office of Steven Schectman*

Δ

• *Specializing in human dignity and corporate responsibility* •

October 19, 2007

Mr. Timothy J. Landrum
US Department of Justice
Drug Enforcement Administration
Los Angeles field division
255 E. Temple St., 17th floor
Los Angeles, CA 90012

By Fax and U.S. Mail

Dear Mr. Landrum;

Please be advised that my office has been retained to represent Arts District Healing Center in matters relating to their leasehold and their use of the premises located at 620 E. 1st St, Los Angeles, CA.

As I am sure you and or other agents are aware, my clients have been litigating the issue of whether the lease that my clients and the owner of 620 E 1st Street entered into is for a legal purpose pursuant California law.  The case has been venued in Judge Goodson's courtroom in Los Angeles Superior Court downtown division was filed on September 5, and was based on a notice that was sent on or about August 5, 2007. The trial was set initially for October 2, then continued to October 15, 2007.

Prior to the trial, the parties stipulated that the sole issue to be determined in the trial would be the legality of the letter you caused to be sent to the owners of the property. Consequently, the determination of the central substantive issue in that case was framed in direct response to your assertion that "federal law takes precedence over state law".  However, because of a procedural mistake made by the plaintiffs, Judge Goodson dismissed the matter without making any decisions on these substantive issues. Judge Goodson did, however, take the time in open Court to explicitly state to the parties that the issues in this case must be decided in court.  The judge also opined that she felt confident both the property owner and the tenant in this matter should be protected while this matter proceeds in the courts.

The concerns expressed by the court, coupled with the events that preceded the trial, cause me to write this letter at this time. On October 11, 2007, agents from your office executed a search warrant at 620 E. 1st St.  As a result of the execution of that warrant, a property list was created which indicated that an un-known quantity of marijuana and currency was seized.  Additionally, several bank accounts were frozen and the funds seized.

---

EX - 4

October 19, 2007
Mr. Timothy J. Landrum
Page 2 of 4

Given that the Arts District Healing Center has been openly operating at that location for the past approximately 18 months and is in close physical proximity to both your office and a Los Angeles Police department substation, it seems reasonable to presume law enforcement was aware of their existence.

The timing of the raid, based on its temporal proximity to the pending trial, and the relatively small amount of medicinal marijuana seized creates the inference that the execution of a warrant may have been sought and executed for impermissible purposes.

Strengthening the reasonableness of this assertion is the fact that it is well known that Los Angeles has many other larger medical marijuana access entities that are and have been operating in very open and visible manner. In addition, there are many publications that contain pages of advertisements informing anyone who cares to read those advertisements of their existence and location. Thus, the question arises, why was the Arts District Healing Center chosen, at this particular point in time, to be the subject of the search warrant.

The apparent selectiveness of the raid on Arts District Healing Center is reinforced by the fact that your office has sent out many dozens of the same type of letter received by the owners of 620 E. 1st St to other property owners in the LA region. Each one of those letters contains the statement that the, "DEA has determined there is a marijuana dispensary, operating at the property (the name of the specific property is inserted). This is a violation of federal law". Thus, your agency had, by its own admission, identified through its investigatory powers the location of dozens and dozens of other entities engaged in the same conduct alleged as the basis of your search of my clients' premises. However, there is one fact that distinguishes my client from all the other medical "marijuana dispensaries" in the entire state of California. The Arts District Healing Center was the only one that had availed itself of the California judicial system in order to litigate the legality of your conduct.

That is not to say I am suggesting that your agency does not have the right to seek search warrants when there is a reasonable basis to believe that a crime may have been committed. However, it is well known that selective enforcement of the law in retaliation for the exercise of legal rights is unconstitutional. I am concerned that your agency apparently determined to seek and execute that search warrant because of the fact that my clients were asserting their constitutional rights to seek redress in our court system. Absent another explanation, the impression left to a reasonable person aware of these facts is that your agency intended to single out my clients for retaliatory and selective treatment seemingly motivatied by political reasons.

Such a result is, in my opinion, antithetical to the mission of law enforcement, which must depend on the public's faith that your agency will use its police powers in a fair and nondiscriminatory manner. Furthermore, it appears to me, that your agency may have exceeded

October 19, 2007
Mr. Timothy J. Landrum
Page 3 of 4

its scope of authority and intruded into the authority reserved for our judiciary.  Specifically, I am
referring to your legal conclusion that federal law takes precedence over state law in matters
relating to the Controlled Substance Act and California's Compassionate Use Act. Your
assertion that federal law takes precedence over state law is, in my opinion, far to abstract to
justify implicitly threatening owners of commercial property with potential prison terms up to 20
years and forfeiture of their property.  This is particularly true given that the underlying lease in
this case is legal under California law, and I do not believe that you can point to a single case
where a property owner in similar circumstance has been punished as your letter threatens. I
would also suggest your office review relevant portions of California's Penal and Civil Codes as
they relate to the circumstance that limit a landlords ability to recover real property under certain
conditions.  Conditions, which may well have been already established in this case.

Please be advised that my clients will be filing an action in state court this coming week in which
they will be seeking declaratory relief regarding the unresolved issues in this case that still
require judicial determination. The action will be filed as a general civil case and as such, will
proceed without any special status regarding its preferences on the trial counter.  As such, it may
be six months to 18 months before the Superior Court of California issues its ultimate
determination regarding tie issue presented by the pleadings.  I believe it would be legally
inappropriate for the parties to this action to be singled out by your agency for an application for
a search warrant, if such decisions were actuated by impermissible and retaliatory reasons.

Based on the above, I am hereby requesting that your agency agree to disclose to the Court, in
any further applications seeking a warrant to search my clients' premises, the good faith basis
that actuates your decision to seek that warrant at that particular time.  I am not asking that you
disclose to me or anyone else other than the court, what those reasons may be.  By agreeing to do
so,  I believe my clients, as well as the general public, will be assured that any further
applications made by your office for a search warrant for my clients leasehold, will not be
actuated by impermissible, retaliatory purposes.

I realize that this may be a rather unique request, perhaps even the first your office has ever
received.  However, I am hopeful that you or those who are properly authorized to do so, will
agree to this request.  I believe that this request is both reasonable and necessary to assure the
public that your agency is not in fact, attempting to discourage certain classes of persons from
availing themselves of our judicial process.

I would greatly appreciate it if you or some other authorized agent of the DEA apprise me of your
response to this letter no later than October 24, 2007.  If your agency chooses not to respond to
this letter or deny the request I have made please be advised that I will be forced to file an action
in the Federal District Court venued Los Angeles. In such action we will seek declaratory and
injunctive relief based on the issues and circumstances and the applicable law that supports these
claims, as described above.

October 19, 2007
Mr. Timothy J. Landrum
Page 4 of 4

The issues I have raised in this letter are serious ones that go to the heart of our democracy.  It is necessary that our system of checks and balances between the judiciary and law enforcement remain intact and enforced.  I hope you agree with the statement and will seriously consider your response.

Please feel free to contact me at the numbers listed below if you have any questions or comments or wish to discuss this matter in greater detail.  I thank you for your time and consideration and look forward to working with you or the legal representative of your agency in a professional manner in order to address these most serious issues.

Sincerely,

Steven Schectman

Cc: Deanne Reuter



**U.S. Department of Justice**
**Drug Enforcement Administration**

*www.dea.gov*                     Washington, D.C. 20537

                                  October 24, 2007

By Facsimile (707) 825-6719

Steven Schectman, Esq.
Pacific Law
Law Offices of Steven Schectman
1125 16th St., Ste 205
Arcata, CA 95521

Re:  Inquiry regarding Arts District Healing Center, Los Angeles, CA

Dear Mr. Schectman,

        This responds to your letter dated October 19, 2007 to U.S. Drug Enforcement
Administration (DEA) Special Agent In Charge Timothy Landrum, Los Angeles Field Division.
DEA, a component of the U.S. Department of Justice (DOJ), is not authorized to disclose
prospective search warrant applications for review as you propose. If you wish to obtain
additional information about the October 2007 search of the above premises, you may file a
request under the Freedom of Information Act (FOIA), or if litigation resumes where the U.S. is
not a party, a proper demand for information can be made under applicable DOJ "Touhy"
regulations.

        FOIA Request Procedures:  DOJ FOIA request procedures are governed by 28 CFR §§
16.1-16.12 (2007). Requests must be writing and describe the records that you seek in sufficient
detail to enable Department personnel to locate them with a reasonable amount of effort. 16
CFR §16.3(b). FOIA requests to DEA should be sent to:

        Drug Enforcement Administration
        Freedom of Information Operations Unit (SARO)
        700 Army Navy Drive
        Arlington, VA 22202

        FOIA Requests for information contained in the files of the Untied States Attorneys
Office should be sent to:

        FOIA/Privacy Staff
        Executive Office of United States Attorneys
        600 E. St. N.W. (BICN Room 7300)
        Washington, D.C. 20530-0001

*Ex-5*

2

"Touhy" Request Procedures. In cases where the U.S. is not a party in litigation, disclosures of information relating to agency business are governed by Federal law. See 28 CFR §§ 16.21 to 16.29 (the "Touhy" regulations) (2007). *United States ex. rel. Touhy v. Ragen,* 340 U.S. 462 (1951). The Code of Federal Regulations provides in relevant part:

> In any federal or state court action in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any material relating to or based upon material acquired as a part of that person's official duties or because of that person's official status without prior approval of the proper Department official in accordance with §§16.24 and 16.25 of this part.

28 CFR § 16.22(a). In order to determine whether approval should be granted, the Code requires the requester to provide to the responsible Department officials "a summary of the information sought and its relevance to the proceeding." Id., 28 CFR § 16.22(d) (emphasis added). As the Code requires, any such demand for information should be provided to the United States Attorney's Office, Central District of California (Attention Civil Chief), who is the release authority. A copy of any such demand should be also provided to this office to expedite release decision processing.

I trust you will find this information useful.

Sincerely,

Michael G. Seidel
Acting Associate Chief Counsel
Administrative Law Section (CCA)

Cc:

SAC Landrum, DEA-LAFD

Civil Chief, USAO, C.D. Calf.